# IN THE COURT OF APPEALS OF TENNESSEE
# AT KNOXVILLE
October 3, 2012 Session

## EDWIN LESTER SMITH v. WILMA NEYMAN SMITH

**Appeal from the Chancery Court for Bradley County**
**No. CV09278    Hon. Jerri Bryant, Chancellor**

---

**No. E2011-02430-COA-R3-CV-FILED-FEBRUARY 20, 2013**

---

This appeal involves a claim filed to recover real property and personalty that was allegedly misappropriated from Decedent prior to his death.  Decedent died at the age of 89, leaving Wife and Son as his survivors.  Prior to his death, Decedent transferred the majority of his monetary assets and real estate to Wife.  Following his death, Son brought this action, alleging that Decedent did not have the mental capacity to execute the transfers and that the transfers were a result of undue influence exercised by Wife, who exploited her confidential relationship with Decedent and also committed fraud to complete the unlawful conversion of the entirety of the estate.  The trial court dismissed Son's claims and awarded any remaining personalty to Wife.  Son appeals.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., P.J. and D. MICHAEL SWINEY, J., joined.

Frank E. Watkins, Jr., Smyrna, Georgia, and Steven C. R. Brown, Birmingham, Alabama, for the appellant, Edwin Lester Smith.

Robert B. Wilson, III, Cleveland, Tennessee, for the appellee, Wilma Neyman Smith.

## OPINION

## I. BACKGROUND

Lester Anah Smith ("Decedent") was born on October 15, 1917.  He married Julia Smith ("First Wife"), who died on February 21, 1989.  One child, Edwin Lester Smith

("Son"), was born of the marriage. On June 1, 1990, Decedent married Wilma Neyman Smith ("Wife"), who was born on January 31, 1927. This was Wife's fourth marriage. One day prior to the marriage, Decedent transcribed a will in which he devised the majority of his estate to Son. Likewise, Decedent stated that he wished to provide a home for Wife for the remainder of her life, one half of his income, and "gifts which [he] may later bestow."

Decedent and Wife resided in the marital home ("Riverwood") that he had shared with First Wife until Decedent sold the home for $375,000 on June 25, 2001. The next day, Decedent and Wife purchased a new home ("Harris Circle") for $205,000 in Cleveland, Tennessee. Decedent and Wife moved to Cleveland, and Decedent transferred his Hilliard Lyons, LLC ("Hilliard") investment accounts from Knoxville to a local office in Cleveland. Decedent opened two accounts, an account in his name ("Account 1") and a joint account that he shared with Son ("Account 2"). Decedent deposited $100,000 from the proceeds of the sale of Riverwood into Account 2. Son never contributed any money to Account 2 and never received any funds contained in Account 2.

On October 23, 2003, Decedent transferred the entirety of the money contained in Account 1 to a newly created joint account that he opened with Wife ("Account 3"). On that day, Decedent transferred approximately $36,939.76 from Account 1 to Account 3. Likewise, Decedent withdrew approximately $100,000 from Account 2.[1] In 2004, Decedent authorized a series of withdrawals from Account 2, leaving a balance of $22.28 that was ultimately depleted several years later. Also in 2004, Decedent transferred his interest in Harris Circle to Wife. In 2005, Decedent made several subsequent deposits into Account 3 in the amounts of $6,129.07, $10,201.92, and $16,330.99.

Decedent died on October 3, 2007. Although Son resided in Wisconsin, he sought appointment as personal representative of Decedent's estate. Son alleged that Wife had improperly obtained the majority of Decedent's assets, leaving only miscellaneous household goods in the estate. Wife filed a petition for an elective share of Decedent's estate, years support, and exempt property. She denied Son's claim and asserted that Decedent's estate merely consisted of household furnishings. She requested appointment as the personal representative of the estate for purposes of general administration and conceded to Son's appointment for purposes of the proceedings relating to her petition. Following a hearing, the court admitted the will to probate and appointed Wife and Son as co-personal representatives of Decedent's estate.

On September 23, 2009, Son filed a complaint against Wife, alleging that Wife engaged in a scheme to impoverish Decedent by transferring Decedent's assets into Account

---

[1] It was unclear from the record where the money in Account 2 was transferred or how it was spent.

3; by eliciting the move to Cleveland, the corresponding sale of Riverwood, and the transfer of ownership in Harris Circle; by usurping the proceeds from the sale of Riverwood and Decedent's life insurance benefits; and by committing fraud on at least three separate occasions. He asserted that Wife forged Decedent's signature on a check, dated October 13, 2005, in the amount of $7,700 ("Check 1"), that Wife forged Decedent's signature on a check, dated April 10, 2007, in the amount of $6,000 ("Check 2"), and that Wife forged his signature and Decedent's signature on a check, dated August 17, 2007, in the amount of $22.28 ("Check 3"). He claimed that Wife also forged Decedent's signature on a check, dated February 13, 2006, that depleted one of Decedent's life insurance policies ("New York Life"). He also claimed that at Wife's direction, Decedent designated Wife as the beneficiary of another life insurance policy ("Metropolitan Life") and that Wife received the benefits of that policy after Decedent's death. Son also sought to bar Wife's petition.

Wife denied Son's allegations. She asserted that she was not in a confidential relationship with Decedent as defined by law and that she never exerted undue influence on him. She claimed that Decedent was mentally competent and was never subservient to her. She alleged that Decedent personally negotiated the sale of Riverwood and the corresponding purchase of Harris Circle and that Decedent was, at all times, in control of his finances and investment accounts. She stated that Decedent's monetary gifts to her were simply evidence of his attempt to provide for her in the event that he predeceased her. Relative to the forgery allegations, Wife responded that at Decedent's request, she and others helped Decedent sign his name by steadying his hand but asserted that she only assisted him when he requested assistance. She denied any knowledge regarding the alleged forgery of Son's signature on Check 3. In any event, she claimed that Son's attempt to set aside or invalidate the sale of Riverwood, the transfer of Harris Circle, and the alleged conversion of Decedent's monetary assets were barred by the applicable statute of limitations.

A hearing was held on Son's complaint at which several witnesses testified. Diana Watkins testified that she attended a family meal on August 22, 2003, at which Decedent, Son, her husband,[2] and others were present. She stated that Decedent usually appeared neatly dressed but that on that day, Decedent was simply casually dressed. She related that Decedent engaged in "very little" interaction and was "withdrawn" throughout the meal. She conceded that Decedent was usually not talkative but asserted that he "usually listened with interest to any conversation that was going on in the room." She believed that on that day, Decedent did not seem "aware of what was going on." She attempted to engage him in conversation about cars, his favorite subject, but he offered vague responses. Saddened by her interaction with him, she sent him a subscription to Motor Trend Magazine in the hope that he would revive his interest in cars. She stated that he never acknowledged her gesture.

---

[2]Mrs. Watkins's husband is Son's attorney, Frank E. Watkins, Jr.

Wife testified that she became acquainted with Decedent and First Wife while she was still married. She stated that after she was no longer married and First Wife passed away, she and Decedent began a relationship and were eventually married. She opined that she and Decedent were happily married and that Decedent was a generous husband. She related that at times, Decedent could be "tight" with his money. She understood Decedent's caution in spending money because he worked hard to accumulate his wealth. She related that while Decedent was reserved, he had a "good personality" and "met the public well." She stated that Decedent was proud of his appearance and was always truthful and a person of high character. She explained that Decedent was an "intelligent man," who was proud of his work and was also "[v]ery strong willed." She insisted that she "never tried" to tell Decedent how to spend his money or make investments.

Wife stated that she and Decedent decided to move to Cleveland because they knew quite a few people in the area and because her family lived in the area. She said that Decedent had lived in Cleveland and was familiar with the area. She recalled that they also considered moving to Chattanooga, Tennessee but that Decedent rejected the idea and made the final decision to move to Cleveland. She related that Decedent negotiated the sale of Riverwood and the purchase of Harris Circle. She insisted that she never told Decedent to put her name on the deed to Harris Circle or to transfer his interest in Harris Circle to her. She said that Decedent told her that he wanted her to have his interest in the property in case he died first.

Wife testified that her children became close to Decedent and visited them often, especially after she and Decedent moved to Cleveland. She related that Son also visited them but that beginning in 2002, he elected to stay in a hotel instead of with them during his visits. She believed that they enjoyed a good relationship with Son. She stated that Decedent never told her about First Wife's will and that after he died, she found a letter from Son in which Son informed Decedent about the will. She recalled that Decedent and Son argued from time to time but that their arguments never lasted long because Decedent loved Son. She asserted that despite Decedent's relationship with Son, Decedent instructed her to refrain from informing Son each time he was hospitalized. She explained that Decedent was simply a private person and did not want Son to worry.

Wife admitted that she did not have much money when she married Decedent but claimed that she had amassed some savings by working until she was 65 years old. She also owned a home, a car, and various pieces of furniture prior to her marriage to Decedent. She related that Decedent sold her home after they were married and instructed her to give the proceeds of the sale to her children. She recalled that she received $30,000 from the sale of her home and that she gave each of her three children $10,000. She stated that in an effort to show fairness, Decedent also gave Son approximately $10,000.

-4-

Wife testified that she did not have a will prior to her marriage to Decedent. She said that once married, they each transcribed documents designating each other as beneficiary of his or her respective estate. She related that she and Decedent "always thought that who died first" would leave "what they had to the other one." She insisted that pursuant to her handwritten document, even though Decedent deeded Harris Circle to her, Decedent would have recouped Harris Circle if she predeceased him. She stated that after Decedent's death, she drafted a will that designated her children as her beneficiaries. She related that her estate consisted of Harris Circle, a car, and approximately $75,000. She also had a life insurance policy in which she designated her children as beneficiaries.

Relative to Decedent's physical health, Wife testified that Decedent was healthy when she married him in 1990, despite his tremors that made it difficult for him to sign his name. She said that he fell a few times while they were living in Knoxville but insisted that Decedent quickly recovered. She conceded that Decedent occasionally suffered from seizures and falls and that he was diagnosed with prostate cancer in 2001 and continually received cancer treatments until his death in 2007. She said that in the last year of Decedent's life, he had to wear adult diapers because he lost control of his kidneys. She stated that Decedent also lost energy, was weak from his treatments, and slept a lot. She recalled that Decedent did not need help with completing every day tasks until the last year of his life.

Relative to Decedent's mental health, she claimed that he never complained about memory problems and that she never observed any changes in his mental capacity. She acknowledged a medical document in which Decedent was diagnosed with dementia in 2005 but did not offer any explanation for the diagnosis. She also acknowledged a 2001 form in which Decedent indicated that he suffered from "forgetfulness" and "nervousness," along with other symptoms. She identified medical documents from 2001 and 2002, in which Decedent indicated that he suffered from a lack of energy, weakness, tiredness, depression, fatigue, memory loss, and disorientation, along with other symptoms.

Relative to the allegations of forgery, Wife explained that she often completed forms for Decedent because of his tremors. Wife identified Check 1 and Check 2 and asserted that she and Decedent endorsed the checks by his or her respective signatures. She denied ever signing Decedent's name on a check but asserted that Decedent had trouble signing his name and would often re-trace his signature or have someone steady his hand while he signed. She also denied ever signing Son's name on a check. She rejected Son's claim that she sought to convert Decedent's assets. She related that Decedent was simply worried about her ability to care for herself in the event that he predeceased her. She insisted that she never pressured Decedent and that he always retained control of the money and made the financial decisions. She claimed that she never withdrew money from any of the Hilliard accounts.

-5-

Son testified that he initially became concerned about Decedent's health when he learned that Decedent had fallen twice in Knoxville. He admitted that Decedent continued to mow the lawn and maintain the house, despite the accidents. He insisted that he noticed a "big change" in Decedent when Decedent and Wife moved to Cleveland in 2001. He complained that Wife did not inform him about Decedent's health issues and failed to notify him when Decedent was hospitalized. He learned of several of the hospital visits after Decedent died. He only learned of a November 2003 hospital visit because he contacted Wife's daughter-in-law after his attempt to locate Decedent was unsuccessful.

Son stated that on August 22, 2003, he drove Decedent to Knoxville to see Decedent's former house and workplace. He also took Decedent to meet several family members once they returned to Cleveland. He identified a photograph of Decedent in which Decedent appeared to have soiled himself sometime before the photograph was taken. He insisted that Decedent would not have allowed the photograph to be taken if Decedent had realized the state in which Decedent appeared. He stated that during the meal, Decedent asked him if he knew where Decedent lived. He said that Decedent did not refer to him by name and did not acknowledge him as his son. He stated that after he took Decedent home, Wife told him that Decedent had asked who the "two young men were that brought him home."[3]

Son testified that prior to First Wife's death, she gave him a copy of her will that devised certain assets to him and his family. He claimed that he did not show the will to Decedent even though Decedent administered First Wife's estate without a will. He stated that he did not give Decedent a copy of the will until shortly before Decedent married Wife. He claimed that Decedent "practically turned white" while looking at the will and that Decedent told him that some of the money had been spent. When he was confronted with a letter, dated March 1, 1989, in which he notified Decedent about the will prior to the administration of First Wife's estate, he admitted that he wrote the letter and sent a copy of the will along with the letter. Son explained that he did not remember writing the letter because it was written shortly after First Wife's funeral. He again acknowledged that despite his and Decedent's knowledge of the will, First Wife's estate was administered without the benefit of the will. He conceded that he also signed a receipt acknowledging that he received everything from the estate that he was entitled to receive. He asserted that he viewed Decedent as a custodian of the items and that he believed he would eventually obtain the items in the will. He related that over the years, Decedent sent him several items even though he never pressured Decedent for the items.

---

[3] Wife insisted that Decedent never forgot Son's identity and that she did not remember ever telling Son that Decedent asked who drove him home.

Son testified that when he visited Decedent in November 2003, he realized that some items were missing. He confronted Wife with the will and asked her to refrain from distributing or selling the items mentioned in the will. He claimed that Wife told him that the items were hers and that he could not have them. He also claimed that his heated discussion with Wife upset Decedent. He said that after he calmed down, he went to lunch with Wife and Decedent. He claimed that when they returned, he went for a ride with Decedent, who had no memory of the argument that occurred that morning.

Relative to Decedent's finances, Son recalled that Decedent designated him as a joint account holder of Account 2. He stated that he did not regularly receive statements for Account 2 and never contributed any money to Account 2. He asserted that someone forged his signature on the account application and that he had no knowledge of the repeated withdrawals from Account 2. He asserted that $50,000 was withdrawn from Account 2 on August 25, 2003, three days after Decedent evidenced signs of confusion. He acknowledged that he received $11,704.91 from one of Decedent's Hilliard accounts in October 1993.

Diane Peterson, a privately trained forensic document examiner, was accepted without objection as an expert in the field of handwriting analysis. She reviewed several of Decedent's known handwriting signatures and compared them with documents Son alleged had been forged. She identified several inconsistencies with eight of the nine documents. She asserted that it was "highly probable" that Decedent did not sign the first four documents, while she also asserted that Decedent "definitely" did not sign four of the remaining documents. However, she asserted that it was "probable" that Decedent signed the ninth document. She also reviewed several of Son's known handwriting signatures and compared them with one signature that Son alleged had been forged. She found that Son did not sign the questioned document.

Ms. Peterson conceded that several of the known documents she used in her analysis were not original documents and that all of the questioned documents were not original documents. She admitted that she preferred to review original documents. She explained that because she exclusively analyzed copied documents relating to four of the questioned signatures, she could only assert that it was "highly probable" that those signatures were forged.

William Varnell, a financial consultant for Hilliard, testified that he worked for Hilliard for approximately 20 years in his Cleveland and Chattanooga office. He recalled that Decedent and Wife hired him as their financial consultant in either late 2001 or early 2002 when Decedent sought to transfer his Hilliard accounts from Knoxville to Cleveland. He recalled that in Knoxville, Decedent had an Individual Retirement Account ("IRA"), an annuity attached to the IRA, and a joint account that he shared with Son. He asked Decedent

whether Son would be transacting business from the joint account, and Decedent told him that the money did not belong to Son. He related that Decedent sought to make safe investments and "was more in a spending mode" than a saving "mode."

Mr. Varnell testified that "a lot of" his clients were older and that he was accustomed to advising and working with older clients. In an effort to ensure that each client had the requisite mental capacity, he explained that he routinely discussed the client's finances and investments in detail. He recalled that in this particular case, he was cautious because Decedent was an older client, because a joint owner was involved, and because Wife was not Decedent's first wife. He stated that Decedent was "a very intelligent, very competent individual that knew exactly what he wanted and what he was doing." He insisted that Decedent remained intelligent throughout his interactions with him but conceded that Decedent "became a little more feeble" in 2006. He claimed that he never observed anything that would change his dealings with Decedent and that Decedent made the decision for each transaction. He stated that while Wife always accompanied Decedent to his office, Wife never advised Decedent. He related that forms were generally filled out by his assistant in Chattanooga and that he simply obtained signatures from clients. He asserted that he was "very specific" in watching who signed documents and that he instructed his secretary to observe Decedent when Wife retrieved a form from the office for Decedent, who occasionally signed documents while in his car.

Martha Jeffries, Mr. Varnell's assistant, testified that she had worked at Hilliard for approximately 13 years. She recalled that she spoke with Decedent and Wife each time they visited the office. She asked Decedent questions about his prior employment and his trips to Dollywood to see the Kingdom Heirs. She insisted that she never observed any interaction between Decedent and Wife that led her to believe that Wife was advising Decedent or instructing him. She related that Decedent appeared knowledgeable about his investments and often spoke with Mr. Varnell after he received his statements in the mail. She claimed that Decedent never appeared confused or incapable of understanding anything.

Linda Marie Epperson, a real estate professional with Re/Max, testified that she represented Decedent in the purchase of Harris Circle. She recalled that Decedent and Wife submitted an offer for Harris Circle shortly after they toured the property. She stated that she had numerous conversations with Decedent and Wife throughout her representation of them in the buying process. She agreed that Decedent had the sufficient mental capacity to "comprehend the transaction," appeared intelligent, and seemed happy to move close to family. She conceded that her interaction with Decedent was limited in nature and duration and that Decedent never asked her about the consequences of purchasing the home as tenants in common as opposed to tenants by the entirety.

Dorothy Barber, a title examiner, testified that on August 12, 2004, she met with Decedent and Wife to prepare a new deed for Harris Circle that would effectively transfer Decedent's ownership rights to Wife. She recalled that she notarized the deed after ensuring that Decedent and Wife understood the implications of the transaction. She specifically recalled that Decedent's signature was shaky, prompting her to delay the transaction. She related that she engaged Decedent in conversation to ensure that he was aware of everything around him and was capable of understanding what was happening. She believed that Decedent understood the transaction and insisted that if she believed otherwise, she would have instructed Decedent to obtain a letter from his physician. She stated that after she notarized the deed, Decedent and Wife promptly recorded the deed.

Wendall Dixon testified that he first became acquainted with Decedent in 1990, when Decedent married his aunt, Wife. He related that he visited Decedent and Wife while they were still living in Knoxville and that he saw them "a lot more often" when they moved to Cleveland. He recalled that his son had a special bond with Decedent. He stated that Decedent loved working outdoors and continued to mow the Harris Circle property until 2005. He admitted that Decedent's physical abilities gradually deteriorated but insisted that Decedent remained "on top of the game mentally" and was an independent, strong willed person. He believed that Wife was "a very caring and giving person" and was "very good" to Decedent.

Janice Neyman testified that she had known Wife, her mother-in-law, for the entirety of her life and that she was also "very close" to Decedent. She recalled that she visited Decedent and Wife at least twice a month in Knoxville and that she and her husband also accompanied Decedent and Wife on their yearly vacations. She stated that after Decedent and Wife moved to Cleveland, she visited with them at least once a week. She related that Decedent even accompanied them on their vacation in 2006. She recalled that while Decedent deteriorated physically, he remained mentally sound and never appeared incompetent.

Following the hearing, the trial court dismissed Son's complaint and declared that "[a]ll gifts, transfers, and conveyances made by [Decedent to Wife], during their marriage" were "fully valid." The court found that Son was not credible, while Wife, Mr. Varnell, and Ms. Jeffries were credible witnesses. Likewise, the court rejected Ms. Peterson's testimony in its entirety and found that her testimony was "far, far, far outweighed" by the testimony from Mr. Varnell, Ms. Jeffries, and Wife. The court noted that Ms. Peterson never examined original documents and that Decedent "was from time to time helped with his handwriting with someone holding his hand." The court admitted that Son presented evidence of Decedent's dementia but found that the majority of the transfers were completed before Decedent suffered from mental impairment. The court held that Decedent's gifts to Wife

were made "in the context of their husband and wife relationship" and that Wife "was the natural object" of his "bounty." The court also held that although Decedent and Wife enjoyed a confidential relationship in that Wife provided care for Decedent, there was "clear and convincing evidence[] to rebut any presumption of invalidity" because all gifts "were fair and completely valid, as the free and informed acts of a capable donor." The court further held that "there was no credible evidence of undue influence," that "there was no evidence that there was anything improper about any transfers," and "that all such gifts [were] valid." The court found that Decedent "handled everything" and was "informed," "strong willed[,] and knew what was going on" and that Wife "did not have the ability to influence him[,] manipulate the investments, or take money out of any investments." The court also found that any claims regarding the conversion of First Wife's property were barred pursuant to the applicable statute of limitations. In the alternative, the court found that the property had been adversely possessed and that Son was precluded from recovery pursuant to the doctrine of laches. In so finding, the court dismissed the complaint and awarded Wife, as exempt property, the entirety of the items listed in the inventory. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal as follows:

A. Whether the trial court erred by rejecting Ms. Peterson's expert testimony.

B. Whether the trial court erred by denying Son's recovery of the items allegedly given to him by First Wife.

C. Whether the trial court erred by failing to find that Wife used her confidential relationship with Decedent to exercise dominion and control over Decedent's assets for her personal use.

## III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

## IV. DISCUSSION

### A.

Son asserts that the trial court did not give Ms. Peterson's testimony its proper weight when the testimony was admitted without objection. The trial court admitted the testimony and observed Ms. Peterson as she examined the documents and submitted her opinions. As the trier of fact, the trial court was permitted to give whatever weight it deemed appropriate to the expert testimony. Where the trial court has seen and heard the witness, especially if issues of credibility and weight to be given oral testimony are involved, considerable deference must be accorded to the trial court on review. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *see also State v. Johnson*, 717 S.W.2d 298, 305 (Tenn. Crim. App. 1986) ("The weight to be given any evidence is a question of fact for the trier of fact in each case."). Following our review, we conclude that the evidence does not preponderate against the trial court's rejection of Ms. Peterson's testimony as an expert witness.

### B.

To the extent that Son complains about his loss of First Wife's property, his complaint was premised upon the tort of conversion. The Tennessee Legislature has limited recovery for actions premised upon the tort of conversion to three years. Tenn. Code Ann. § 28-3-105. The testimony introduced at trial reflected that Son was aware of the alleged conversion in November 2003, when he realized that some items were missing and subsequently confronted Wife, who proclaimed that he could not have the items because they belonged to her. However, Son did not file his complaint until September 23, 2009. Thus, his allegations relating to the alleged conversion of property that occurred prior to that time are barred by the applicable three-year statute of limitations.

### C.

Son asserts that Wife's marriage to Decedent gave rise to a confidential relationship, allowing her to unduly influence Decedent in an effort to obtain his assets and the entirety of his interest in real property. He believes that Wife embarked upon an elaborate scheme to drain Decedent of his assets and property because she believed that, as his wife, she was entitled to receive everything Decedent owned. Wife responds that Decedent's repeated transfers of assets and real property were gifts, evidencing an intent to provide for her in the event that he predeceased her.

"[T]he doctrine of undue influence is applicable only where there is a confidential relationship[.]" *In re Estate of Brevard*, 213 S.W.3d 298, 302 (Tenn. Ct. App. 2006) (citing

*Keasler v. Estate of Keasler*, 973 S.W.2d 213, 219 (Tenn. Ct. App. 1977)). A confidential relationship is a relationship where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the weaker or dominated party. *Bills v. Lindsay*, 909 S.W.2d 434, 440 (Tenn. Ct. App. 1993); *see also Kelley v. Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002). The routinely recognized presumption is that when a confidential relationship exists and the dominant party receives a benefit from the other party that the dominant party used undue influence to obtain the benefit. *Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn. 1997); *Matlock v. Simpson*, 902 S.W.2d 384, 385 (Tenn. 1995); *Hogan v. Cooper*, 619 S.W.2d 516, 519-20 (Tenn. 1981).

"Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is." *Kelley*, 96 S.W.3d at 197 (citing *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974)). Confidential relationships generally arise in two situations: (1) "legal relationships" and (2) "family and other relationships." *Brevard*, 213 S.W.3d at 302-03 (quoting *Matlock*, 902 S.W.2d at 385-86). In the "legal relationships" context, a confidential relationship arises when there is some legal connection between the dominant party and the weaker party, such as when a dominant party is granted a power of attorney. *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002). Indeed, "a confidential relationship arises *as a matter of law* when an unrestricted power of attorney is granted to the dominant party." *Id.* (emphasis added). In contrast, "[f]amily and other relationships" do not necessarily give rise to a confidential relationship per se; therefore, to establish a confidential relationship in this situation, contestants must prove the elements of "*domination and control*" in order to establish that the free will of the weaker party was destroyed and that the will of the dominant party was substituted. *Matlock*, 902 S.W.2d at 385-86 (emphasis added). "The burden of proof regarding a confidential relationship rests upon the party claiming the existence of such a relationship." *Childress*, 74 S.W.3d at 328.

The trial court concluded that while the transfers of monetary assets and interest in real property were obtained through Wife's marital relationship with Decedent, the transfers were ultimately valid and fair. In contrast, we believe that Son failed to even establish that Wife enjoyed a confidential relationship with Decedent. There was no evidence introduced to establish that Wife enjoyed a fiduciary relationship with Decedent as established through an unrestricted power of attorney. Thus, her alleged confidential relationship with Decedent must have arisen out of their marital relationship. Son cites *Bratton v. Bratton*, 136 S.W.3d 595 (Tenn. 2004) in support of his proposition that all marital relationships give rise to a confidential relationship. We disagree.

The language used in *Bratton* and other similar cases did not establish a bright-line rule that all parties in a marriage enjoy a confidential relationship as a matter of law. We acknowledge that in *Bratton*, the Tennessee Supreme Court stated,

> Because of the confidential relationship which exists between a husband and wife, postnuptial agreements are likewise subjected to close scrutiny by the courts to ensure that they are fair and equitable.

136 S.W.3d at 601 (citations omitted). The Court set aside the postnuptial agreement at issue for lack of consideration, noting that parties in a marital relationship do not deal "'with each other as strangers at arm's length.'" *Id.* at 601-04. Unlike the postnuptial agreement in *Bratton*, the transfers complained of in this case were not accomplished pursuant to a contract, where Decedent and Wife bartered to construct a mutually agreeable deal. The transfers in this case were anything but mutually agreeable. Thus, the issue in this case is not whether there was sufficient consideration to support the transfers but whether Wife had the ability to exert dominion and control over Decedent and whether she used that ability to unduly influence Decedent's purportedly benevolent gestures. While the relationship between Wife and Decedent should be closely scrutinized, the burden remained upon Son to establish that a confidential relationship existed between Decedent and Wife. *Childress*, 74 S.W.3d at 328.

Following our review, we defer to the trial court's credibility determinations in this case on this issue. *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000) ("Unlike this [c]ourt, the trial court observed the manner and demeanor of the witnesses and was in the best position to evaluate their credibility."). The only credible evidence offered to establish Wife's control of Decedent consisted of the fact that Wife drove Decedent and may have assisted him in filling out forms and signing his name. The testimony reflected that Decedent remained strong willed and in control of his finances throughout the entirety of his life. A number of credible witnesses testified that Decedent also appeared knowledgeable and did not appear to be acting pursuant to Wife's direction. Likewise, the court found that Wife "did not have the ability to influence him[,] manipulate the investments, or take money out of any investments." The evidence simply did not establish that Wife possessed the type of confidential relationship that would have allowed her to exercise dominion and control over Decedent. While we sympathize with Son's loss of any form of inheritance from Decedent, the record reflects that Decedent simply chose to provide for Wife in the event that he predeceased her. Testimony introduced at trial established that Decedent and Wife enjoyed a loving, 17-year marriage prior to his death. Despite Son's loss, we cannot fault Decedent for ensuring that Wife was provided for after his death. Accordingly, we affirm the judgment of the trial court. *See City of Brentwood v. Metro. of Zoning Appeals*, 149 S.W.3d 49, 60 n. 18 (Tenn. Ct. App. 2004) ("The Court of

-13-

Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result.").

Having affirmed the trial court's judgment, we must acknowledge the fact that several documents that were not considered by the trial court were appended to Son's appellate brief and submitted for our review on appeal. Likewise, Wife complains that Son highlighted deposition testimony in his appellate brief that was never submitted to the trial court for consideration as evidence. Son asserts that the challenged deposition testimony was included in his closing argument. Closing arguments are not evidence and cannot be considered as evidence. *Wilson v. Americare Sys. Inc.*, No. M2008-00419-COA-R3-CV, 2009 WL 890870, at *6 (Tenn. Ct. App. Mar. 31, 2009). Additionally, parties may not "add to or subtract from the record except insofar as may be necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(g). While some of the challenged documents arguably added clarification to the issues on appeal, these documents should not have been included in the appellate brief as if they had been admitted by and considered by the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Edwin Lester Smith.

_____
JOHN W. McCLARTY, JUDGE

-14-